942 F.2d 1352
 60 USLW 2125
 Jenny Lisette FLORES, a minor, by next friend Mario Hugh
GALVEZ-MALDONADO; Dominga Hernandez-Hernandez, a minor, by
next friend Jose Saul Mira; Alma Yanira Cruz-Aldama, a
minor, by next friend Herman Perililo Tanchez, Plaintiffs-Appellees,
v.
Edwin MEESE, III; Immigration & Naturalization Service;
Harold Ezell, Defendants-Appellants.
 No. 88-6249.
 United States Court of Appeals,
Ninth Circuit.
 Argued En Banc and Submitted April 18, 1991.
Decided Aug. 9, 1991.
 
 Ian Fan and Stan Blumenfeld, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellants.
 Carlos Holguin, National Center for Immigrants' Rights, Inc., Los Angeles, Cal., for plaintiffs-appellees.
 William F. Abrams, Jeffer, Mangels, Butler & Marmaro, San Francisco, Cal., James H. Lovell, Heller, Ehrman, White & McAuliffe, Seattle, Wash., Vilma S. Martinez, Munger, Tolles & Olson, Laini Millar-Melnick, Los Angeles, Cal., Susan L. Burrell and Mark I. Soler, Youth Law Center, San Francisco, Cal., E. Richard Larson, Mexican-American Legal Defense and Education Fund, Los Angeles, Cal., John R. Heisse, II, Pettit & Martin, San Francisco, Cal., for the amici curiae.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE, Chief Judge, and TANG, SCHROEDER, D.W. NELSON, CANBY, NORRIS, WIGGINS, BRUNETTI, THOMPSON, LEAVY, and RYMER, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 This is a class action challenging an INS policy that requires governmental detention of children during the pendency of deportation proceedings. That policy is now codified at 8 C.F.R. § 242.24 (1988). Detention is required unless there is an adult relative or legal guardian available to assume custody, even where there is another responsible adult willing and able to care for the child and able to ensure the child's attendance at a deportation hearing. The INS acknowledges that the regulation is not necessary to ensure such attendance. It does not contend that the release of children so detained would create a threat of harm to the children or to anyone else.
 
 
 2
 The district court held that a blanket detention policy in such circumstances is unlawful. It entered an order that required, where feasible, release to a responsible party of children who would otherwise have been released if a parent or other relative had come forward. The order further required an administrative hearing for each child to determine whether, and under what conditions, the child should be released.
 
 
 3
 The INS and Attorney General appealed and a divided panel reversed the district court's holding that the detention policy was unlawful. The panel remanded for the district court to determine what procedural protections would be appropriate under Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine whether there was sufficient cause to detain a juvenile pending further proceedings. A majority of active judges voted to rehear the case en banc because of the importance of the issues involved and the impact of the policy on large numbers of children arrested as illegal aliens in the Western United States. We now affirm the district court's order.
 
 II. BACKGROUND
 
 4
 This case concerns the treatment of children who are arrested on suspicion of being illegal aliens but who have not yet been determined to be deportable. Because the children are persons present in the United States they must be afforded procedural protections in conjunction with any deprivation of liberty. Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976).
 
 
 5
 Plenary authority to determine what categories of aliens may lawfully reside in the United States and what categories must be deported resides in the Congress. Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). Congress has delegated the duties of the administration of the immigration laws to the Attorney General, who oversees the work of the Immigration and Naturalization Service. 8 U.S.C. § 1103(a) (granting the Attorney General authority to "establish such regulations ... as he deems necessary" to administer and enforce the immigration laws).
 
 
 6
 Only one relevant statutory provision addresses the release or detention of aliens between the time of their arrest and the determination of deportability or non-deportability. That statute is 8 U.S.C. § 1252(a)(1), which in all material respects has remained the same for the last four decades. It presently provides:
 
 
 7
 Pending a determination of deportability ... [an] alien may, upon warrant of the Attorney General, be arrested and taken into custody.... [A]ny such alien ... may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond ... containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole.
 
 
 8
 To implement this statute, the Attorney General promulgated regulations in 1963, which are still in effect, providing that aliens arrested on the suspicion of deportability could be released until further proceedings upon a determination that such release was appropriate, and under conditions determined by the INS. 8 C.F.R. § 242.2(c)(2). Upon request, an alien is entitled to a hearing before a disinterested officer, an immigration judge, to determine eligibility for release. 8 C.F.R. § 242.2(d).
 
 
 9
 In 1984, the Western Region of the INS adopted a separate policy for minors. That policy provided that minors would be released only to a parent or lawful guardian. In his memorandum implementing this policy, former Western Region Commissioner Harold Ezell stated that the limits on release were "necessary to assure that the minor's welfare and safety is maintained and that the agency is protected against possible legal liability." The policy also provided for release to another responsible adult "in unusual and extraordinary cases, at the discretion of a District Director or Chief Patrol Agent." The Regional Commissioner did not refer to any problems that had arisen under existing regulations. He did not cite any instances of harm which had befallen children released to unrelated adults, nor did he make any reference to suits that had been filed against the INS arising out of allegedly improper releases. It has remained undisputed throughout this proceeding that the blanket detention policy is not necessary to ensure the attendance of children at deportation hearings.
 
 
 10
 Implementation of this policy sparked concern in a number of quarters because the policy resulted in the governmental detention of a large number of children who posed no apparent risk to the community and whose presence at their respective hearings could be ensured by responsible individuals. Various individuals and groups, including many appearing as amici in this rehearing en banc, were among those who reacted adversely to the new policy. These included church groups, Amnesty International, Lawyers' Committee for Human Rights, International Human Rights Law Group and Defense for Children International.
 
 
 11
 During the course of this litigation, the INS codified the regional policy into the nationally applicable regulation now at issue. In promulgating that regulation, the INS did not refer to any particular problem that had arisen in the course of administering the immigration laws as they affected children. Rather, it simply cited the "dramatic increase in the number of juvenile aliens" found unaccompanied by a parent, guardian or a adult relative. 53 Fed.Reg. 17,449 (May 17, 1988). The regulation allows release to a somewhat broader class of people than did the Western Region policy, i.e., a variety of adult relatives as opposed to just parents and legal guardians, but it prohibits release in cases where other responsible adults are available to take custody of the minor. It permits release to unrelated adults only in "unusual and compelling circumstances." 8 C.F.R. § 242.24.[1]
 
 
 12
 In promulgating the regulation, the INS recognized that the principal factor bearing on release or detention is the likelihood of appearance at future proceedings. It also recognized that the policy of preventing release to responsible adults was not related to the issue of flight risk or the administration of any provision of the immigration laws. Its principal justification for the detention rule was the theory that unless the INS were able to do a comprehensive "home study" of the proposed custodian, the child's own interests would be better served by detention. The INS stated:
 
 
 13
 As with adults, the decision of whether to detain or release a juvenile depends on the likelihood that the alien will appear for all future proceedings. However, with respect to juveniles a determination must also be made as to whose custody the juvenile should be released. On the one hand, the concern for the welfare of the juvenile will not permit release to just any adult. On the other hand, the Service has neither the expertise nor the resources to conduct home studies for placement of each juvenile released.
 
 
 14
 53 Fed.Reg. at 17,449.
 
 
 15
 In response to comments suggesting that release to responsible adults should be permitted on a regular basis, the INS stated that it did not have the resources or expertise necessary to make a determination, in each case, whether release to the adult in question would be in the child's best interests. 53 Fed.Reg. at 17,449. The INS did not state any basis for its assumption that home studies would have to be conducted. Nor did the INS indicate that it had conducted such studies before releasing children to unrelated adults prior to the promulgation of this policy. Commenters also complained that the regulation's provision that release to unrelated adults could occur in "unusual and compelling circumstances" was too vague to provide meaningful guidance. The INS responded that such vagueness was deliberate, designed to provide "the broadest possible discretion" to INS officials. Id. Finally, commenters suggested that the INS should permit individuals or organizations to act as intermediaries between the INS and the parent or guardian of an alien child, to allow for release where that parent or guardian is afraid to come forward personally because of his or her own illegal alien status. After pointing out that "[t]his proposal raises some of the same concerns that release to any reliable adult raises, for example, the inability of the Service to perform home studies," the INS concluded that it would "continue to consider the proposal," but would promulgate the regulation without such a provision at this time. Id. at 17,450. The final regulation was approved on May 17, 1988.
 
 
 16
 The named plaintiffs, including named plaintiff Jenny Flores, filed the action on July 11, 1985, challenging the Western Region's policy then in effect. These named plaintiffs represented a class of minors who do not pose a risk of flight or harm to the community, and have responsible third parties available to receive them, and are thus being detained only because no adult relative or legal guardian is available to take custody of them. Their complaint contained a number of claims. In the panel majority opinion, Judge Wallace described them as follows:
 
 
 17
 The first claim alleged that the Western Region's bond release condition violated the Immigration & Nationality Act (INA), 8 U.S.C. § 1101 et seq., the Administrative Procedure Act (APA), 5 U.S.C. § 552 et seq., the fifth amendment's due process clause and equal protection guarantee, and international law. Flores's second claim challenged the INS's failure to provide (1) "prompt written notice" to the detainee that the bond release condition had been imposed, and (2) "prompt, mandatory, neutral and detached" review following arrest of (a) whether probable cause to arrest existed, (b) whether imposition of the bond condition was necessary to ensure future appearance, and (c) whether any available adult was suitable to ensure the detained juvenile's well-being and appearance at future proceedings. The second claim alleged that these failures violated due process and international law. Plaintiffs' last five claims, which challenged various conditions of the minors' confinement, ... were resolved by settlement or motion....
 
 
 18
 Flores v. Meese, 934 F.2d 991, 995 (9th Cir.1990) (as amended). After the policy originally in question was codified as a regulation, this litigation was maintained as a challenge to that regulation.
 
 
 19
 Between the time that the complaint was filed and the promulgation of the national regulation implementing the Western Region policy, the district court disposed of several motions. With respect to the limitation on release to parents or legal guardians, the court ruled the provision violated equal protection. It agreed with Flores that the INS' practice of permitting alien minors in exclusion proceedings to be released to a broader class of adults than those in deportation proceedings was not supported by a rational justification. See 8 C.F.R. § 212.5(a)(2)(ii) (1987) (alien minors in exclusion proceedings could be released to adult relatives or to non-relatives). When the INS promulgated the regulation here at issue, it amended the regulation regarding release of children in exclusion proceedings to incorporate by reference the same restrictions as those operative in the deportation context, thus mooting the district court's ruling on this issue. See 8 C.F.R. § 212.5(a)(2)(ii) (1988). The court still had under advisement various motions relating to the procedural implementation of the INS' policy when the INS promulgated the official regulation.
 
 
 20
 Upon promulgation of the regulation, the district court asked for supplemental briefs and then entered an order granting summary judgment to the plaintiff class. The order invalidated the blanket detention of minors where a responsible adult could ensure attendance at the deportation hearing, and it required a hearing before a neutral and detached official in each case to determine whether release was appropriate and the conditions of release. The order provided:
 
 
 21
 1. Defendants ... shall release any minor otherwise eligible for release on bond or recognizance to his parents, guardian, custodian, conservator, or other responsible adult party. Prior to any such release, the defendants may require from such persons a written promise to bring such minor before the appropriate officer or court when requested by the INS.
 
 
 22
 2. Whenever a minor is released as aforesaid, the minor shall be promptly advised in writing in a language he understands of any restrictions imposed upon his release.
 
 
 23
 3. Any minor taken into custody shall be forthwith afforded an administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release. Such hearing shall be held with or without a request by or on behalf of the minor.
 
 
 24
 The Attorney General and INS appealed. The majority of the panel for our court vacated the first paragraph of the district court's order, holding that the detention policy did not implicate any of the plaintiffs' fundamental rights, and that due deference to the INS' choices in implementing congressional immigration policy required approval of the INS detention policy restricting release. The majority characterized the right claimed by the class as a substantive due process right "to be released to an unrelated adult." Slip op. at 10788. Finding that the Constitution does not guarantee such a right, the majority applied a highly deferential standard of review to what it saw as an exercise of the INS' unique expertise and authority.
 
 
 25
 In considering the procedural aspects of the district court's order as embodied in paragraph three, the panel majority remanded. It rejected the appellees' contention that the fourth amendment requirement of review by a neutral and detached magistrate of probable cause for arrest, as the Supreme Court has enunciated in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), was applicable in the context of civil deportation proceedings. Rather, it chose as the appropriate model for procedural due process evaluation the balancing test outlined in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). That test would involve a balancing of the children's interest in release to a responsible adult, which the majority viewed as not constitutionally protected, against the governmental interests, which it viewed as entitled to substantial deference.
 
 
 26
 Judge Fletcher, in dissent, described the case as "among the most disturbing I have confronted in my years on the court." 934 F.2d at 1013. She characterized the district court's order as a "simple, sensible, minimally intrusive direction," id. at 1014, to protect the fundamental liberty interests of the plaintiffs who, in her view, should not be denied liberty when their "only possible offense is their alienage." Id. at 1013.
 
 
 27
 In their petition for rehearing en banc, plaintiffs contend, inter alia, that the panel majority erred in failing to recognize their fundamental interest in liberty. It also erred, they argue, in holding that, under either Gerstein v. Pugh or Mathews v. Eldridge, any procedure other than an individual hearing before an independent officer could provide adequate protections for the right at stake.
 
 
 28
 Before us for decision are three principal sets of issues. The first involves the detention policy itself and whether it affects any constitutionally protected liberty interests of the plaintiffs. The second involves the nature of the federal governmental interest furthered by such a policy, the justifications set forth by the agency for such a policy and the extent to which we must defer to the agency in the promulgation of such policies. The third is whether, after examination of these issues, the appropriate procedural model for the determinations at issue is the criminal model of Gerstein v. Pugh or the civil model of Mathews v. Eldridge, or indeed whether, in the context of this case, it makes any difference whether a criminal or civil model is chosen. Our discussion focuses on each of these areas in turn.
 
 III. DISCUSSION
 
 29
 Defendants maintain that the plaintiffs' liberty interests are limited because of their status as aliens and children. We therefore examine in some detail the manner in which courts and Congress deal with the questions of rights of aliens and children.
 
 A. Plaintiffs' Interests as Aliens
 
 30
 The Constitution protects the rights of aliens to due process and equal protection. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Even illegal aliens enjoy the due process protections of the fifth amendment. Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976). It is now well established that under these cases any person present in the United States is entitled to equal justice before the law, including procedural protections in conjunction with any deprivation of liberty, and freedom from invidious discrimination. See C. Antieau, 1 Modern Constitutional Law §§ 9:25-9:27 (1969 & Supp.1991).
 
 
 31
 A crucial component of the right to personal liberty is the ability to test the legality of any direct restraint that the government seeks to place on that liberty. This ability is guaranteed through the availability of the writ of habeas corpus to challenge the lawfulness of one's imprisonment. The right to seek such a writ has its roots in English law that predates the formation of this nation. See Habeas Corpus Act of 1679, 31 Car. II Ch. 2. It was incorporated among the first rights guaranteed by the United States Constitution. U.S. Const. art. I, § 9. There thus can be no question that this right is a key part of the American legal system.
 
 
 32
 In any discussion of the constitutional guarantee of liberty, the importance of habeas corpus must not be understated. As one commentator has described it:
 
 
 33
 Over the centuries habeas corpus has been the common-law world's "freedom writ" by whose process the courts may require the production of all prisoners and inquire into the legality of their incarceration, failing which they have been set free. Of the writ of habeas corpus, the United States Supreme Court has appropriately noted: "There is no higher duty than to maintain it unimpaired."
 
 
 34
 1 Modern Constitutional Law § 5:148 at 436 (quoting Bowen v. Johnston, 306 U.S. 19, 26, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939)). For this reason, to assess the nature of an alien's liberty interest, it is appropriate to look to the extent courts have historically recognized such an interest through habeas corpus proceedings.
 
 
 35
 It has long been accepted that alienage does not prevent a person from testing the legality of confinement through habeas corpus. See Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). Indeed, even a would-be immigrant who is prevented from landing in the United States and is, in that way, deprived of liberty "is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful." Nishimura Ekiu v. United States, 142 U.S. 651, 660, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). Thus, the status of the plaintiff class in this case as aliens whose presence in this country might be illegal does not affect their right to put the government to its proof concerning the legality of their detention.
 
 
 36
 That the detention at issue here is a civil detention imposed in the course of administering the immigration laws does not alter the relevance of the principles of habeas corpus. Still the leading case involving a test of the legality of detention under immigration laws is Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952). In that case, the Supreme Court dealt with a petition for habeas corpus by aliens detained prior to deportation under the Internal Security Act of 1950, because of their membership in the Communist Party of the United States. Noting that "[d]eportation is not a criminal proceeding" and thus the detention at issue was administrative, not punitive, 342 U.S. at 538, 72 S.Ct. at 533, the Court nevertheless employed habeas corpus review as the appropriate means for the individual aliens to challenge their detention.
 
 
 37
 The petitioners in Carlson challenged their pre-deportation detention on the ground that there had been no sufficient showing that they presented an actual risk of flight or harm to the community if released pending further proceedings. Rather, they were denied release on a finding that each was an active member of the Communist party. This finding, they argued, was not sufficient to support detention. See 342 U.S. at 533-34, 72 S.Ct. at 530-31.
 
 
 38
 The Court rejected this argument on the ground that the decision to detain them based on their active membership in the Communist party was made through an exercise of the discretion delegated to the Attorney General under the immigration laws. The delegated discretion was to determine which aliens pose a threat of harm to the community. The Court held that detention based on Communist party membership and activity was not an abuse of that discretion. The Court noted that the evidence went "beyond unexplained membership and show[ed] a degree ... of participation in Communist activities." 342 U.S. at 541, 72 S.Ct. at 534. Because the Court also agreed with the INS that "the doctrines and practices of Communism clearly enough teach the use of force to achieve political control," id. at 535-36, 72 S.Ct. at 532, it found that the detention of the petitioners was proper since they posed "a menace to the public interest." Id. at 541, 72 S.Ct. at 535.
 
 
 39
 The Court was careful to observe, however, that the discretion of the Attorney General was not without bounds. The INS policy in Carlson did not amount to blanket detention. The Court pointed out that there was "no evidence or contention that all persons arrested as deportable ... for Communist membership are denied bail." Id. at 541-42, 72 S.Ct. at 535. It went on to note that the evidence before it indeed illustrated that release pending further proceedings was granted "in the large majority of cases." Id. at 542, 72 S.Ct. at 535.
 
 
 40
 The most recent comprehensive Supreme Court discussion of an individual's interest in liberty is set in the context of adults held in pretrial detention without regard to citizenship. United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Court there recognized "the individual's strong interest in liberty," which it characterized as a "fundamental" right with which Congress could interfere only with a "careful delineation of the circumstances under which detention will be permitted...." 481 U.S. at 750-51, 107 S.Ct. at 2103. Detention was justified only by clear and convincing evidence that the arrestee presented "an identified and articulable threat to an individual or the community...." Id. at 751, 107 S.Ct. at 2103. Significantly, the Court drew a parallel between the detention at issue in Carlson and that challenged in Salerno by noting that the Carlson petitioners were permissibly detained during the pendency of deportation proceedings because they were "potentially dangerous." 481 U.S. at 748, 107 S.Ct. at 2102. It did not in any way suggest that aliens' liberty interests were any less fundamental than those of citizens.
 
 
 41
 History may have passed Carlson by in some respects, particularly in its assessment of the danger attending political activity, but the case, in significant respects relevant to this case, provides guidance. Carlson holds that under our Constitution and an Immigration Act materially the same as the current one, the INS cannot detain individuals without a particularized exercise of discretion through which it determines that detention of an individual would prevent harm to the community or further some other important governmental interest Congress has delegated to the INS. See also C. Gordon and S. Mailman, 1 Immigration Law and Procedure § 1.03[d] (1988) ("the alien in deportation proceedings may be detained or required to post bond only upon a finding that he is a threat to the national security or likely to abscond.").
 
 
 42
 Thus, we must hold that aliens have a fundamental right to be free from governmental detention unless there is a determination that such detention furthers a significant governmental interest. That right is secured by the Constitution in its enumerated guarantee of habeas corpus to all individuals, including aliens, to test the validity of their detention through judicial scrutiny of the basis for confinement at the hands of the government. See Salerno, 481 U.S. 739, 107 S.Ct. 2095; Carlson, 342 U.S. 524, 72 S.Ct. 525; Wong Wing, 163 U.S. 228, 16 S.Ct. 977.
 
 B. Plaintiffs' Interests as Children
 
 43
 The plaintiffs are not only aliens; they are also minors. The INS contends that this factor materially changes the nature of their liberty interest, thereby rendering the detention policy reasonable and appropriate. We therefore turn to the question of what effect the juvenile status of these plaintiffs may have on the analysis of their liberty interests and the protections that must be given to those interests.
 
 
 44
 The Constitution protects the rights of children to due process of law in conjunction with any deprivation of liberty. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). While a child accused of an offense may be subject to pretrial detention based on a determination that release is not safe for the child, such a determination has been held to meet the mandates of due process only where made by a neutral and detached official, with the justifications for detention clearly stated. Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). This holding is in keeping with the general rule that freedom from institutional confinement should be the norm, from which any deviation must be supported with specific reasons. As one set of commentators has observed, a child's "right to be treated in the manner least restrictive to the child's liberty ... has its roots in the well-settled concept that, while constitutional rights may be restricted by the state for legitimate purposes, the restriction must be no greater than necessary to achieve these purposes." R. Horowitz and H. Davidson, Legal Rights of Children § 10.10 at 431 (1984). This proposition flows from the Supreme Court's general pronouncement that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnotes omitted). Under these principles, governmental confinement of a child to an institution should be a last resort.
 
 
 45
 Policies constructed to deal with the confinement of children at both the state and federal levels have recognized the practical need to avoid institutional detention where less restrictive means are available. It is the states, rather than the federal government, which are primarily responsible for child welfare issues. State courts have articulated the view that institutional confinement should be used only when another type of placement such as foster care is not possible. See, e.g., R.P. v. State, 718 P.2d 168 (Alaska App.1986) (state must prove by a preponderance of the evidence that less restrictive alternatives are not possible); In re John H., 48 A.D.2d 879, 369 N.Y.S.2d 196 (1975) (other options must first be fully explored). In addition to protecting any constitutional interests of the children, this avoidance of institutionalization is seen to serve their best interests. See generally S. Davis, Rights of Juveniles § 6.3 (1990) (discussing states' attempts to ensure that a child benefits in some way from whatever type of placement is ultimately chosen).
 
 
 46
 Congressional policy, where relevant, also favors avoidance of the institutionalization of juveniles. The federal government does have the occasion to process juvenile offenders when, for example, they violate federal laws or commit crimes on Indian reservations. In such situations, the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031 et seq., governs the treatment of the offenders. That Act's provisions regarding detention specify that it should occur in "a foster home or community based facility" instead of an institution, if possible. 18 U.S.C. § 5035 (regarding pre-disposition detention); 18 U.S.C. § 5039 (regarding detention after disposition). These provisions evidence an understanding that the juvenile's liberty should be curtailed only by the least restrictive means necessary to achieve the purpose at hand, and that the interests of juveniles and of society are best served by keeping such offenders in homes rather than in institutions whenever practicable.
 
 
 47
 The foregoing analysis compels the conclusion that, just as the plaintiffs' entitlement to liberty absent a valid, particularized basis for confinement does not diminish due to their alienage, their minority does not materially change the nature of that entitlement. The INS is therefore incorrect when it asserts that plaintiffs have no fundamental liberty interest at stake. The INS is also incorrect in asserting that to prevail, the plaintiffs must be able to find in the Constitution itself, or law interpreting the Constitution, an express recognition of a "substantive due process right to be released to an unrelated adult." Such release is not the constitutional interest being secured. It is the remedy the district court imposed after ruling that the defendant's policy unconstitutionally interfered with plaintiffs' interest in freedom from unjustified governmental detention.
 
 
 48
 Whether the imposition of such a remedy was appropriate depends upon whether the detention serves a significant federal governmental purpose. It is to that issue that we now turn.
 
 C. Government Purposes Involved
 
 49
 This case is unprecedented in that it involves post-arrest detention of persons who have not been convicted of any crime, do not pose a risk of flight, and who have not been determined to present any threat of harm to themselves or to the community. Whatever purposes detention serves, they do not relate to punishment, to the need for attendance at further proceedings, or to avoidance of an identifiable risk of harm. Contrast Salerno, 481 U.S. 739, 107 S.Ct. 2095; Schall, 467 U.S. 253, 104 S.Ct. 2403; Carlson, 342 U.S. 524, 72 S.Ct. 525.
 
 
 50
 The INS articulates two reasons for the detention. First, the INS suggests that the child's interests would be better served by detention than by release to a responsible adult whose living environment the INS does not have the means to investigate. Second, it asserts that the policy is necessary to protect it from potential liability in the event some harm should befall the child after release.
 
 
 51
 The INS does not articulate any legal basis for its position that these are valid INS concerns. The first flies in the face of the Supreme Court's ruling in Gault that children should be treated in a manner least restrictive of liberty. It also expresses a view contrary to the Supreme Court's decision in Schall, which required a foreseeable risk of harm to justify detention. While the Supreme Court in Schall recognized that a child, because of a lack of maturity, should have some adult custody and care, 467 U.S. at 265, 104 S.Ct. at 2410, it did not remotely suggest that there may be a presumption in favor of governmental detention as serving the best interests of the child.
 
 
 52
 The INS in essence maintains, however, that we should not look behind their articulation of concerns because we must defer to any such articulation. Agencies are, of course, entitled to some deference when they make determinations that relate to an area of their special expertise. See United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). In the immigration field, then, courts owe deference to decisions of the INS where its special experience and authority in the area of alienage are called into play. See Carlson, 342 U.S. at 540-41, 72 S.Ct. at 534-35.
 
 
 53
 The justifications asserted here, however, relate to child welfare and the potential liability of child welfare agencies. Child welfare is not an area of INS expertise and its decisions in this area are not entitled to any deference. See Hampton v. Mow Sun Wong, 426 U.S. 88, 114-15, 96 S.Ct. 1895, 1910-11, 48 L.Ed.2d 495 (1976) (court does not defer to agency determination in area outside of agency's expertise). Nor does this policy carry out any express congressional directive. Rather, the policy is contrary to Congress' determination that institutional detention of juveniles is disfavored. See 18 U.S.C. §§ 5035; 5039. One of the very reasons the INS gives for detaining the plaintiffs is that it does not have the expertise, and Congress has not given it the resources, to do the kind of evaluation of foster care facilities that state child welfare agencies do on a routine basis. The INS reasons that since it is unable to do such an evaluation, the best interests of the child must lie in detention rather than in release. The Constitution requires the opposite conclusion. See Gault, 387 U.S. 1, 87 S.Ct. 1428. We therefore hold that the INS may not determine that detention serves the best interests of members of the plaintiff class in the absence of affirmative evidence that release would place the particular child in danger of some harm.
 
 
 54
 Our conclusion that the INS cannot maintain a blanket policy of detention thus does not absolve the INS from the responsibility of making individualized decisions concerning the fate of children it has arrested. Due process requires a particularized exercise of discretion in conjunction with the decision to grant or deny release to any alien. See Carlson, 342 U.S. at 542, 72 S.Ct. at 535. It is, of course, within the purview of the INS to determine whether or not the person available to assume custody will ensure the child's attendance at future proceedings. It is also within the purview of the INS to determine on the basis of the particular case whether release of the child poses a danger to the community or could result in harm to the child. The blanket refusal to make individualized determinations in the guise of administrative expediency, however, cannot pass constitutional muster. See, e.g., Reed v. Reed, 404 U.S. 71, 76-77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (administrative convenience does not justify a policy that otherwise runs afoul of the Constitution).
 
 
 55
 The INS' secondary justification for its detention policy is that if it released a child to an unrelated adult based on a determination short of a detailed "home study," it could be subject to liability in the event that some harm befell the child. The INS does not specify the source of such liability.
 
 
 56
 We find little indication that the INS would be subject to liability for releasing a minor to an unrelated adult without a "home study." Such a "study" is concededly beyond the expertise of the Service. The Supreme Court's holding in Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), would give an individual a cause of action against the INS for a violation of constitutional rights, an action analogous to the cause of action available through 42 U.S.C. § 1983 against those who violate federal rights under color of state law. The Supreme Court has recently held, however, that a state agency, with far more expertise in child welfare than the INS, could not be held liable under section 1983 for allowing a child to remain in the custody of an adult despite clear evidence that such custody placed the child in danger. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Court concluded that the actions of a private citizen could not form a basis for liability of the Department under section 1983. It did not matter, the Court held, that the child had formerly been in state custody, because "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." Id. at 201, 109 S.Ct. at 1006.[2]
 
 
 57
 Decisions before and since DeShaney, as well as DeShaney itself, compel the conclusion that governmental agencies face far greater exposure to liability by maintaining a special custodial relationship than by releasing children from the constraints of governmental custody. See DeShaney, 489 U.S. at 200-201, 109 S.Ct. at 1005-06 (emphasizing that absence of duty on the part of the state to ensure child's safety arose from the fact that the plaintiff was not in the state's custody at the time of the injury); Youngberg v. Romeo, 457 U.S. 307, 316-17, 102 S.Ct. 2452, 2458-59, 73 L.Ed.2d 28 (1982) (when individual is in state custody, state may acquire constitutional duty to ensure individual's safe care); Lashawn A. v. Dixon, 762 F.Supp. 959, 996 (D.D.C.1991) (under DeShaney and Youngberg, state agency may be liable for constitutional tort where it fails to provide adequately for the safety and well being of children in its custody). We reject the INS' claim that it must detain these children to avoid lawsuits. In so doing, we follow the lead of the Supreme Court, which has recently refused to uphold an argument that possible tort liability justified a policy that violated the rights of individuals, where such liability was "remote at best." International Union, UAW v. Johnson Controls, Inc., --- U.S. ----, 111 S.Ct. 1196, 1208, 113 L.Ed.2d 158 (1991).
 
 
 58
 We therefore conclude that the first paragraph of the district court's order is an appropriate means to prevent incarceration of juveniles where such incarceration serves no legitimate purpose of the INS. It provides that release to a responsible adult shall occur only if the child would have otherwise been eligible for release to a relative under the challenged policy. It takes into account the need to secure attendance at immigration proceedings, and does not foreclose the ability of the INS to order detention if there are other, valid reasons for detention. In addition, by specifying that where there is no relative or legal guardian available release may be made to a "responsible" party, it allows room for the INS to make the necessary determination of whether a party who is willing to assume custody of the child is fit to do so.
 
 
 59
 D. Procedural Due Process and Part Three of the District
 
 Court's Order
 
 60
 From the beginning of this litigation the parties have disputed whether the determination of what process is due in conjunction with the decision to detain members of the plaintiff class should be made pursuant to Gerstein, 420 U.S. 103, 95 S.Ct. 854, or Mathews, 424 U.S. 319, 96 S.Ct. 893. In Gerstein, the Court determined that a "timely judicial determination" was a mandatory prerequisite to pretrial detention in the criminal context. 420 U.S. at 126, 95 S.Ct. at 869. In Mathews, the Court articulated a three-factor analysis designed to be applicable generally to questions of due process in conjunction with administrative actions. A reviewing court must consider first the private interest that the action affects, second the risk that the procedures currently utilized will result in an erroneous deprivation of that interest and the extent to which that risk could be lessened by the addition of more safeguards, and third the government's interest in maintaining the current procedures. 424 U.S. at 335, 96 S.Ct. at 903. The plaintiffs have urged that Gerstein be followed, while the INS has argued that Mathews provides the proper mode of analysis.
 
 
 61
 Because we have held that the plaintiffs' interest in freedom from detention requires that the decision to detain be made only in conjunction with a neutral and detached determination of necessity, we must affirm Part Three of the district court's order regardless of whether we apply Mathews or Gerstein. In so doing, we note that under current regulations, the INS is already required to maintain the mechanisms for providing review by an Immigration Judge of any decision to detain an alien or of conditions imposed on the release of such alien, if the alien requests such a hearing. See 8 C.F.R. § 242.2(d). The only new requirements that Part Three of the district court's order places on the INS are that, if the alien is a child, such a hearing must be held regardless of whether the alien requests it, and the determination at the hearing must include an inquiry into whether any non-relative who offers to take custody represents a danger to the child's well being. The first of these additional requirements is reasonable because the members of the plaintiff class, as children, are less capable than others of understanding what they are waiving by failing to request a hearing. The second is reasonable in light of the private interest at stake. We therefore conclude that Part Three of the district court's order provides the appropriate procedural safeguards for the deprivation here at issue, and accordingly uphold it.
 
 IV. CONCLUSION
 
 62
 The district court correctly held that the blanket detention policy is unlawful. The district court's order appropriately requires children to be released to a responsible adult where no relative or legal guardian is available, and mandates a hearing before an immigration judge for the determination of the terms and conditions of release.
 
 
 63
 The majority panel opinion is VACATED and the order of Judge Kelleher is AFFIRMED in all respects.
 
 TANG, Circuit Judge, concurring:
 
 64
 I concur wholeheartedly in the majority's judgment and I concur in the majority opinion insofar as it goes. I write separately to emphasize my belief that the liberty interest at issue--freedom from governmental detention and restraint--is a fundamental right expressly protected by the fifth amendment to the Constitution. Indeed, freedom from governmental restraint is the core, the very crux of any governmental system dedicated to preserving the integrity and inviolability of the individual. I write separately also to highlight the two distinct deprivations of liberty occasioned by the INS's policy.
 
 A. The Right at Issue
 
 65
 The original panel opinion in this case and the current dissent denominate the right at issue as the "right to be released to unrelated adults." This characterization of the children's liberty interest stands the Constitution on its head. It presumes the government's right to detain and requires children, who have committed no offense greater than being suspected of being deportable, to prove their entitlement to release. Even assuming that non-textual rights need to be carefully articulated, there is no reason to afford "liberty"--language right out of the Constitution's text--such a cramped interpretation.
 
 
 66
 I agree with the majority's conclusion that one textual source of the right to freedom from governmental restraint is the Constitution's habeas corpus guarantee. U.S. Const. art. I, § 9. The majority's analysis of the constitutional basis for the right at issue is not complete, however.
 
 
 67
 Physical freedom from governmental detention and restraint--liberty in its most elemental form--is a fundamental constitutional right guaranteed by the due process clause of the fifth amendment. This freedom from governmental restraint is both a substantive right and an entitlement to certain procedural protections when the government acts to deprive a person of physical liberty.
 
 
 68
 A recent acknowledgment of the substantive due process right to freedom from governmental restraint can be found in DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In DeShaney, the Supreme Court expressly stated:
 
 
 69
 In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause.
 
 
 70
 Id. at 200, 109 S.Ct. at 1006.
 
 
 71
 The DeShaney court's observation was not novel. Numerous precedents already recognized the individual's fundamental right to freedom from restraint. See, e.g., United States v. Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987) ("Respondents [invoke] ... the 'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial. Such a 'general rule' may freely be conceded...."); Youngberg v. Romeo, 457 U.S. 307, 309, 316, 319, 102 S.Ct. 2452, 2454, 2458, 73 L.Ed.2d 28 (1982) (Court recognizes "substantive right[ ] under the Due Process Clause" to "freedom from bodily restraint" and observes that "[i]n other contexts, the existence of such an interest is clear in the prior decisions of this Court. Indeed, '[l]iberty from bodily restraint always has been recognized as the core of liberty protected by the Due Process Clause from arbitrary governmental action,' " (quoting Greenholtz v. Inmates, Nebraska Penal & Correctional Complex, 442 U.S. 1, 18, 99 S.Ct. 2100, 2109, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part))); Parham v. J.R., 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) ("It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment.").[1]
 
 
 72
 These cases recognize explicitly what our constitutional jurisprudence historically has acknowledged implicitly through presumptions and assumptions about the relationship between government and the governed in this country. Liberty is the norm; arrest, detention, or restraint by the state is the exception. To operate otherwise makes a mockery of "government of the people, by the people." Some of our most cherished rights--freedom of speech and of religion, the right to vote, travel, and to be free from unreasonable searches and seizures--would mean nothing if we had to live under the heavy hand of government.
 
 
 73
 The strict burdens that the Constitution imposes on government's efforts to deprive individuals of their liberty reveal that freedom from governmental restraint is a fundamental right and the cornerstone of democratic government. Government may not incarcerate a person unless it proves that person's guilt beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Government may not arrest and detain persons absent probable cause to believe a crime has been committed by them. Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). The brief delay in physical freedom occasioned by a stop-and-frisk cannot be imposed absent a reasonable and particularized suspicion of danger. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The operative assumption in our society is that government may not intrude into the private sanctuary of the individual. Exceptions will be made if, and only if, the state makes a very strong showing of necessity.
 
 
 74
 To reduce liberty, as the original panel and the dissent suggest, to nothing more than an entitlement to certain procedural protections and thereby to burden the children with showing a "right to release" ignores the very substance of the Bill of Rights. The Bill of Rights, including the fifth amendment, is our country's blueprint for individual freedom. It maps out limits beyond which the government may not step. Our conception of liberty should thus be drawn in terms of what government may not do (restrain) rather than in terms of what children must do (show entitlement to release).
 
 
 75
 To see the right in strictly procedural terms fails to recognize that the genesis of these procedures and presumptions is our Constitution's fundamental belief in the sovereignty of the individual. It is this principle that defines the substantive right to liberty, to freedom from governmental restraint. The rules and presumptions mandated by procedural due process are not themselves "liberty." Rather, they are the indispensable guarantees and requirements of the substantive right to freedom from governmental restraint. Liberty under the due process clause is thus both a process and a condition, and it is a right with which the children who brought this action are endowed.[2]B. Procedural Due Process
 
 
 76
 Defining the right at issue only begins our constitutional inquiry. That a right is fundamental does not mean that it is inviolable. See, e.g., Youngberg, 457 U.S. at 319-20, 102 S.Ct. at 2459-60 (liberty interest protected by substantive due process is not absolute). Just as government may on occasion limit speech or religious practices, so may government restrict or deny physical liberty to some extent, upon making the constitutionally-mandated showing of necessity. We thus must determine whether the limitations imposed by the INS on the children's liberty comport with the substantive and procedural components of the fifth amendment's due process clause.
 
 
 77
 Much of the unease occasioned by the INS's policy and the original panel's opinion derives from the fact that the INS imposes conditions on a child's release before there is even a neutral and independent review of its authority to detain a child (and, concomitantly, to limit her release). This puts the cart before the horse. We cannot fairly discuss the INS's ability to condition the children's release or its interest in ensuring the children's return and safety until the INS has established its authority to detain the children in the first instance. Unlike the majority, I turn therefore to the procedural due process issue before addressing the constitutionality of the release conditions.
 
 
 78
 Much of the parties' debate focuses on whether Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54, or Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), prescribes the appropriate framework for the procedural due process analysis. I agree with Judge Rymer's conclusion that Mathews governs. Deportation is a civil, not a criminal, proceeding. See Carlson v. Landon, 342 U.S. 524, 537-38, 72 S.Ct. 525, 532-33, 96 L.Ed. 547 (1952). The Supreme Court has repeatedly invoked Mathews to test the constitutionality of civil deprivations of liberty. See, e.g., Landon v. Plasencia, 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982) (INS exclusion proceedings); Parham, 442 U.S. at 599-600, 99 S.Ct. at 2502-03 (commitment of children to mental health facility); Greenholtz, 442 U.S. at 14, 99 S.Ct. at 2109 (parole hearings); Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (involuntary commitment of children to mental hospital); Ingraham v. Wright, 430 U.S. 651, 675, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977) (corporal punishment of students); see also Salerno, 481 U.S. at 746, 107 S.Ct. at 2101 (regulatory pretrial detention under Bail Reform Act); accord Youngberg, 457 U.S. at 320-21, 102 S.Ct. at 2460-61 (involuntarily committed patients). While the children correctly point out that the Court frequently cites Gerstein in these cases, the opinions speak, and the analysis is conducted, in the language of Mathews. Because the Supreme Court has used Mathews to test the propriety of a variety of civil incarcerations, including an INS proceeding, we must apply Mathews in this instance.
 
 
 79
 In applying Mathews, we must balance (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirement would entail. Mathews, 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 80
 The private interest at issue is, of course, the children's liberty from governmental detention and restraint. This interest is substantial and compelling. "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington, 441 U.S. at 425, 99 S.Ct. at 1809; see also Salerno, 481 U.S. at 750, 107 S.Ct. at 2103 (noting the "importance and fundamental nature of this right [to liberty]"); Schall v. Martin, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984).
 
 
 81
 Moreover, the adverse consequences of detention are legion, consequences exacerbated by the youth of the detainees. Detention by the government stigmatizes children, regardless of the ultimate resolution of their respective cases. Children in INS detention centers enjoy, at best, very limited educational and recreational opportunities. They are away from family and friends; every aspect of their daily life is regulated by strangers. See Plasencia, 459 U.S. at 34, 103 S.Ct. at 330 (right to regain family "ranks high among the interests of the individual"). They have very little privacy, may be shackled and handcuffed, and lead a very regimented life.
 
 
 82
 Furthermore, the risk of an erroneous deprivation of liberty by the INS is substantial. As Judge Fletcher pointed out in her dissent from the original panel's decision in this case, many persons arrested by the INS will ultimately prove not to be deportable. Some of these children will be found to be citizens, legal aliens, or entitled to political asylum.
 
 
 83
 Currently, an officer's determination of deportability is subject only to review by a second immigration officer, who determines whether prima facie evidence of a violation of the immigration laws exists. 8 C.F.R. § 287.3. If no second officer is available, the prima facie determination may be made by the original arresting officer. Id. At no point does an official detached from the enforcement function test the sufficiency of the evidence to arrest and detain. See id.[3]
 
 
 84
 Our Constitution has long recognized that combining the roles of prosecutor and adjudicator in a single entity is a recipe for fundamentally unfair and erroneous decision making. See, e.g., Schweiker v. McClure, 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982) ("As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."); Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) ("an impartial decision maker is [an] essential" component of due process); Tumey v. Ohio, 273 U.S. 510, 534, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927) ("A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process."); see also Parham, 442 U.S. at 606, 99 S.Ct. at 2506 (civil commitment of mentally ill children must be reviewed by neutral fact finders); Gerstein, 420 U.S. at 114, 95 S.Ct. at 863.
 
 
 85
 These cases recognize the importance of neutral and detached review as a protection against the overzealous prosecutor or law enforcement official.
 
 
 86
 A democratic society, in which respect for the dignity of all [persons] is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic.
 
 
 87
 McNabb v. United States, 318 U.S. 332, 343, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943); see also Shadwick v. City of Tampa, 407 U.S. 345, 350, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783 (1972) (probable cause for issuance of an arrest warrant must be determined by an official independent of the police and prosecution); Coolidge v. New Hampshire, 403 U.S. 443, 450, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971) (prosecutor's responsibility to law enforcement is inconsistent with the constitutional role of a neutral and detached magistrate).
 
 
 88
 The INS's procedure does nothing to protect against the risk of error and unfairness. The field officer's determination is, at best, reviewed by another law enforcement officer. At worst, the arresting officer reviews his own decision. The INS cites no case, nor have any been found, where the Supreme Court has tolerated a deprivation of physical liberty unaccompanied by any provision for independent and neutral review of the decision to incarcerate. To the contrary, statutory schemes for detention (civil or criminal) previously reviewed by the courts have involved some measure of independent review of the initial decision to detain. See, e.g., Salerno, 481 U.S. at 750, 107 S.Ct. at 2103 (pretrial detention predicated upon governmental showing by clear and convincing evidence to a neutral decisionmaker of need to detain); Schall, 467 U.S. at 269-70, 104 S.Ct. at 2412-13 (juvenile detention reviewed for probable cause by member of judicial branch); Parham, 442 U.S. at 606-07, 99 S.Ct. at 2506-07 (commitment of children must be reviewed by a neutral and detached trier of fact); see also In Re Gault, 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (child committed to juvenile detention entitled to hearing containing "the essentials of due process and fair treatment"). Our Circuit's precedent similarly insist upon the neutral review of decisions to restrain individuals for any significant period of time. Gary H. v. Hegstrom, 831 F.2d 1430, 1433 (9th Cir.1987) (due process hearings for adolescents detained for criminal behavior); Doe v. Gallinot, 657 F.2d 1017, 1023 (9th Cir.1981) (involuntary commitment decisions must be reviewed by independent decisionmaker to reduce error, since consequences of liberty deprivation are so severe).
 
 
 89
 With respect to the third Mathews factor, the INS asserts in vague and conclusory terms that it will be burdened by a mandate to provide prompt impartial review of its officers' findings of probable cause to arrest and detain children. The INS provides no specifics, however. Both the record and common sense, on the other hand, reveal that the requirement need not be unduly burdensome. A quasi-judicial scheme of administrative judges (immigration judges) already exists within the INS that could provide the necessary detached review. The institution of such a practice, moreover, will relieve INS law enforcement officers of the duty to review their fellow officers' arrests to determine whether a prima facie case for deportability exists.
 
 
 90
 Given the substantial liberty interest involved, the proven record and constant risk of error, and the failure of the INS to articulate anything more than vague and unsubstantiated objections to neutral review, I conclude that the due process clause requires the INS promptly to afford detained children an impartial and detached review of their detention. At such a hearing, the burden must be on the INS to demonstrate the propriety of detention. Gallinot, 657 F.2d at 1023 ("It is the state, after all, which must ultimately justify depriving a person of a protected liberty interest....").
 
 C. Conditions on Release
 
 91
 Once the INS has demonstrated before a neutral and detached decisionmaker a prima facie case of deportability, the INS's legitimate interests in ensuring that child's return for future hearings and, to some extent, that child's safety entitle it to impose conditions on the child's release. Those conditions, however, may not restrict the child's liberty any more than is necessary to achieve the INS's stated goals of ensuring return and safety.
 
 
 92
 I wholeheartedly agree with the majority's holding that the regulation's prohibition on release to responsible third parties cannot survive scrutiny under the due process clause. Where, as here, the children detained have not individually been shown to be a flight risk, a threat to the community or to themselves, or guilty of any crime, governmental restrictions on liberty must be narrowly tailored to promote the government's articulated interests.
 
 
 93
 As the majority aptly demonstrates, the INS has not shown that precluding release to child welfare agencies, church groups, immigration rights' groups, and other responsible third parties increases the risks of flight or injury to the child. Unsubstantiated speculation that flies in the face of the historic record of successful releases to third parties cannot outweigh the children's compelling liberty interest. On the other hand, the tragic consequences of prolonged detention are readily discernible. Nor are the INS's liability concerns sufficient to justify confined detention. As the majority notes, the legal liability accompanying prolonged detention greatly exceeds the INS's unproven and overblown apprehensions about legal exposure after release to a responsible third party.
 
 CONCLUSION
 
 94
 While the majority and I differ to some extent in our analyses of the constitutional issues presented, our points of agreement are much more numerous. I believe that the children's fundamental right to freedom from government detention has its roots, not only in the Constitution's guarantee of habeas corpus, but also in the fifth amendment's protection against deprivations of liberty without due process. I also agree with the majority's reasoning and conclusions concerning the conditions on release and procedural due process. I write separately on these issues only to emphasize that we are dealing with the constitutionality of two distinct deprivations of liberty--the initial decision to detain and secondly the conditions imposed upon release after detention. Only when the initial and most drastic deprivation of liberty has been accomplished in a manner that comports with the Constitution can we then address the legality of the INS's release conditions.
 
 WILLIAM A. NORRIS, Circuit Judge, concurring:
 
 95
 I join Judge Schroeder's opinion for the en banc court, but write separately to say that the INS' policy of incarcerating children pending deportation hearings rather than releasing them to the temporary custody of responsible non-relative adults, not only violates due process, but does so flagrantly.
 
 
 96
 This case does not involve the fashioning of some "new" substantive due process right to "be released to unrelated adults," see dissenting op. at 1379 (Wallace, C.J.). It has nothing to do with the controversy over constitutional protection of privacy interests. The dissent's concern about limiting the reach of "substantive due process" and its reliance on such cases as Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986),[1] unnecessarily cloud the issue. If the word "liberty" as used in the Due Process Clause means anything, it means "liberty from bodily restraint ... [which] is at the heart of the liberty protected by the Due Process Clause." Board of Pardons v. Allen, 482 U.S. 369, 373 n. 3, 107 S.Ct. 2415, 2418 n. 3, 96 L.Ed.2d 303 (1987). The Supreme Court has repeatedly said that liberty includes freedom from bodily restraint as an absolute minimum. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1953) (" '[L]iberty' ... is not confined to mere freedom from bodily restraint."); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1922) ("[L]iberty.... denotes not merely freedom from bodily restraint...."). Because the prehearing detention of children so clearly deprives them of their liberty, the Due Process Clause requires the INS to justify its policy by "sufficiently compelling governmental interests." United States v. Salerno, 481 U.S. 739, 748, 750, 107 S.Ct. 2095, 2102, 2103, 95 L.Ed.2d 697 (1986).
 
 
 97
 The governmental interests asserted by the INS to justify its policy are trivial. The INS admits that its policy does not even serve the government's legitimate interest in assuring the children's appearance at deportation hearings. What the INS' justification for its policy boils down to is money. It claims that it does not have the "competence" or "resources" to "conduct meaningful screening ... of the environment in which the children will live". Appellants' Response to Order Dated August 20, 1990 at 6-7. It characterizes home studies as a "delicate undertaking" that is "ordinarily carried out by skilled social workers." Id. Translated, this means that our government chooses to hold children in detention facilities, despite the INS' lack of competence to care for them, rather than pay for the services of qualified social workers to conduct home studies of the kind that county social service agencies perform routinely. The INS makes no effort to price such services, nor does it make any effort to show that the cost of such services would be greater than the cost of holding the children in the INS' own detention facilities. It merely throws up its bureaucratic hands and shrugs that it has no money to pay for home studies.
 
 
 98
 The INS' justification for its policy pales in comparison with the governmental interests that have been held to justify prehearing detention. These children are not dangerous, as in Salerno, 481 U.S. at 741, 107 S.Ct. at 2098 (approving detention of the head and "captain" of the Genovese crime family when "no release conditions 'will reasonably assure ... the safety of any other person and the community.' ") and Schall v. Martin, 467 U.S. 253, 264, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984) (upholding detention of juvenile accused of hitting a youth over the head with a loaded gun under law "designed to protect the child and society from the potential consequences of his criminal acts"). Neither are they a menace to the public interest, as in Carlson v. Landon, 342 U.S. 524, 541, 72 S.Ct. 525, 534, 96 L.Ed. 547 (1952) (upholding detention of alien Communist Party members to prevent "menace to public interest"), or a threat to the national security, as in Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948) (approving detention during World War II of enemy aliens found to be dangerous).
 
 
 99
 In an effort to salvage the INS policy, the dissent goes so far as to assert that the Due Process Clause provides less protection for the liberty of children than for the liberty of adults. Liberty interests are not "weighed differently for minors in comparison with adults, as the dissent suggests." See dissenting op. (Wallace, C.J.) at 1380 (citing Schall ). Schall stands for the quite different proposition that a juvenile's liberty interest can "in appropriate circumstances be subordinated to the State's parens patriae interest in preserving and promoting the welfare of the child." Schall, 467 U.S. at 265, 104 S.Ct. at 2410 (emphasis supplied). Here the INS has no parens patriae interest to weigh against the juvenile's liberty interest. The dissent casts the INS as a parent, but I see only a jailer.
 
 
 100
 Finally, the mere incantation of Congress' plenary power over immigration policy should not be the siren song that leads us astray from applying settled due process principles to the facts of this case. Congress' broad power to fashion immigration policy no more authorizes the INS to hold people without due process than a state's sovereign power to pass criminal laws authorizes the imprisonment of people without due process. By invoking Congress' power to set standards of deportability as an excuse for the detention of children pending hearings on their deportability under those standards, the dissent blurs the distinction between the enactment of immigration laws and the enforcement of those laws. I know of no authority for the dissent's boundless description of the "judiciary's limited judicial role" in reviewing all "immigration decisions" or any action it can relegate to "the immigration context." See dissenting op. (Wallace, C.J.) at 1380-1381. In applying due process principles, we balance "interests," not "contexts."
 
 
 101
 The very cases that the dissent cites for limiting judicial review of all "immigration decisions" recognize the crucial distinction that the dissent ignores. "In the enforcement of ... [immigration policies], the Executive Branch of the Government must respect the procedural safeguards of due process.... [even if] the formulation of these policies is entrusted exclusively to Congress." Fiallo v. Bell, 430 U.S. 787, 792 n. 4, at 793, 97 S.Ct. 1473, 1478 n. 4, at 1479, 52 L.Ed.2d 50 (1977), quoting Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954). Thus, the cases cited by the dissent are inapposite in a case involving the detention of children during the process of enforcing the immigration laws. For example, Adams v. Howerton, 673 F.2d 1036 (9th Cir.), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982), involved judicial deference to a congressional decision to deny immigration preferences to partners in same sex relationships. Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954), and Harisiades v. Shaughnessy, 342 U.S. 580, 589-90, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952), upheld statutes making Communist Party members deportable. Finally, Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977), upheld a statute denying immigration preferences to illegitimate children whose mothers are aliens, but whose fathers are citizens or lawful permanent residents. None of these cases involved the procedures followed by the INS in enforcing the immigration laws passed by Congress.
 
 
 102
 In sum, the deprivation of the children's liberty is so plain, and the government's interest in detaining them so trivial, that the due process violation could not be more clear-cut.
 
 
 103
 RYMER, Circuit Judge, concurring in the judgment in part and dissenting in part:
 
 
 104
 I agree with the majority that this case is particularly troubling. The thought of prolonged detention of children who have done nothing more than to be in this country illegally, and to be without a parent or relative willing to come to their rescue, touches a raw nerve in us all. Even so would we be sickened were one of these children to be precipitously released to abuse, neglect or worse.[1] A constitutionally appropriate balance must therefore be struck between the alien minors' interest in freedom from institutional restraint and the government's responsibility for their safety.
 
 
 105
 I write separately even though I agree with much of the majority's bottom line, because I believe the case can be decided more narrowly and in a way that will safeguard valuable rights more effectively than the district court's order. I part company with both the district court and the majority to the extent they hold that the Constitution substantively requires release to any responsible adult who will promise to bring the minor to future hearings, and I disagree that a probable cause hearing is constitutionally required for juveniles held in deportation proceedings. Instead, I conclude that current INS procedures are constitutionally insufficient to afford an alien juvenile the process she is due when it has been determined that she may be released from INS custody, but that she has no parent, guardian, adult relative, or person designated by a parent or guardian to assume custody. Without assurance of an early determination by a neutral hearing officer of whether to release the juvenile under these circumstances, and absent an outside limit on the length of time the juvenile may continue to be held even though it has been determined that she is eligible for release, the risk that the child will be unduly detained outweighs the government's remaining interests in maintaining custody and assuring well-being.
 
 
 106
 The Due Process Clause of the Fifth Amendment assures that "No person shall ... be deprived of life, liberty, or property, without due process of law...." The Supreme Court has held that
 
 
 107
 the Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' Rochin v California, 342 US 165, 172, 96 L Ed 183, 72 S Ct 205 , 25 ALR 1396 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' Palko v Connecticut, 302 US 319, 325-326, 82 L Ed 288, 58 S Ct 149 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. Mathews v Eldridge, 424 US 319, 335, 47 L Ed 2d 18, 96 S Ct 893 (1976). This requirement has traditionally been referred to as 'procedural' due process.
 
 
 108
 United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987).
 
 
 109
 The district court's judgment does not indicate which component was violated. To the extent its order requires a substantive change in the regulation--directing release to a "custodian, conservator, or other responsible adult party" who promises to bring the minor to future hearings, I infer that the court believed § 242.24(b)(4) runs afoul of due process on substantive grounds; I assume it also found the regulation wanting on procedural due process grounds since it ordered an administrative hearing to determine probable cause for the minor's arrest and need for restrictions on her release.
 
 
 110
 While Flores does contend that the minors' interest in personal liberty is a fundamental constitutional right that substantively overrides the INS restriction on release of children, in her brief to this court and at oral argument she concedes that the district court's order may be seen as wholly procedural and could be affirmed on procedural grounds. Because I agree that the INS's regulation falters for lack of minimum procedures comporting with due process, I see no need to reach more broadly at this time.[2]
 
 
 111
 The fifth amendment protects physical freedom by requiring that the government satisfy rigorous procedural safeguards before taking it away. Procedural fairness has traditionally been tested under Mathews v. Eldridge, 424 U.S. 319, 334-335, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976). The Court restated the framework for analysis in Landon v. Plasencia, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), an immigration case, as follows:
 
 
 112
 The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances. In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures.
 
 
 113
 Id. at 34, 103 S.Ct. at 330 (citations omitted).
 
 
 114
 The alien juveniles' interest has considerable weight: they stand to continue losing freedom from INS restraint even though the INS will not have determined that they need to be detained for reasons of flight or safety.[3] On the other hand, the government's interests in the well-being of minors in its custody and in assuring that these children not be entrusted to the care of an unqualified person are likewise strong. In addition,
 
 
 115
 [t]he Government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature. The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.
 
 
 116
 Id. at 34-35, 103 S.Ct. at 330 (citations omitted).
 
 
 117
 Flores challenges the regulation on four scores: (1) lack of a probable cause hearing on deportability; (2) lack of a prompt custody hearing; (3) failure to impose a burden of proof on the government; and (4) absence of independent review. She urges that the district court's order, imposing limited procedural safeguards, be affirmed. While the INS agrees that the record permits Flores's procedural due process claim to be resolved by this court without remand for further proceedings, it argues that the claim lacks merit because there is minimal risk of erroneous deprivation of the minors' interest. It relies on 8 U.S.C. § 1357(a)(2), which provides that an alien must be taken for examination before an officer other than the one who arrested her "without unnecessary delay," and on a regulation that requires the examining officer to be satisfied that there is prima facie evidence to believe the alien is deportable. 8 C.F.R. § 287.3 (1990). It therefore argues that even if Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), applies in a civil proceeding, the district court erred in mandating a probable cause hearing because the INS's standard is higher and is subject to review by an examining officer as well as the arresting officer. For these reasons it contends that requisite standards of fairness are met.
 
 
 118
 Turning first to whether a probable cause hearing is required, I agree with the INS that importing Gerstein to a civil immigration proceeding is problematic, see INS v. Lopez-Mendoza, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (consistent with civil nature of deportation proceeding, protections such as exclusionary rule that apply in context of criminal trial are not applicable). No authority suggests that a probable cause hearing before a neutral magistrate, as distinguished from a prima facie evidence hearing before an examining officer, is constitutionally mandated in deportation proceedings. Our cases suggest the contrary, see, e.g., Trias-Hernandez v. INS, 528 F.2d 366, 368 (9th Cir.1975) (declining to require Miranda warnings in deportation proceeding); Lavoie v. INS, 418 F.2d 732, 734 (9th Cir.1969) (sixth amendment safeguards not applicable in deportation proceeding), cert. denied, 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970), and there is no call to hold otherwise.
 
 
 119
 The INS's argument, however, fails to come to grips with the absence of other, well-recognized ingredients of procedural fairness. Unlike the statutes at issue in Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), and Salerno, which survived due process challenges,[4] the INS regulations provide no opportunity for the reasoned consideration of an alien juvenile's release to the custody of a non-relative by a neutral hearing officer.[5] Nor is there any provision for a prompt hearing on a § 242.24(b)(4) release. No findings or reasons are required. Nothing in the regulations provides the unaccompanied detainee any help, whether from counsel, a parent or guardian, or anyone else. Similarly, the regulation makes no provision for appointing a guardian if no family member or legal guardian comes forward. There is no analogue to a pretrial services report, however cursory. While the INS argues that it lacks resources to conduct home studies, there is no substantial indication that some investigation or opportunity for independent, albeit informal consideration of the juvenile's circumstances in relation to the adult's agreement to care for her is impractical or financially or administratively infeasible. Although not entirely clear where the burden of proof resides, it has not clearly been imposed on the government. And there is no limit on when the deportation hearing must be held, or put another way, how long the minor may be detained. In short, there is no ordered structure for resolving custodial status when no relative steps up to the plate but an unrelated adult is able and willing to do so.
 
 
 120
 Current procedures tend to deprive the minors of their interest in release in at least two major respects. First, there is no process there. While procedures provided by the executive in immigration matters are rarely held inadequate, Landon, 459 U.S. at 33, 103 S.Ct. at 329, some process is due. See Carlson v. Butterfield, 342 U.S. 524, 538, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952). Nothing in this regulation triggers any determination at any particular time of whether an alien juvenile who is presumptively eligible for release, but has no family, may be released to the custody of an unrelated adult who will agree to her care and appearance. Nor is there any light at the end of the tunnel; there is no time limit on continued detention, despite the child's eligibility for release. For all that appears from the regulations, the juvenile without parent, guardian or relative is left in procedural limbo. Second, there is no provision for reasoned consideration by a neutral hearing officer. Time limits and impartiality are not uncommon procedures; both are basic safeguards against arbitrary action. See, e.g., Salerno, 481 U.S. at 751-52, 107 S.Ct. at 2103-04; Schall, 467 U.S. 257 n. 3, 270, 104 S.Ct. 2403 n. 3, 2413.[6] To omit both increases the risk that the juvenile for whom detention is not needed and for whom there is a prospective adult willing to assume care and assure appearance will not be released because of inattention, inadvertence or intransigence.
 
 
 121
 With these protections in place, I see no problem with the regulation's failure to put the burden of proof on the government. I do not construe § 242.24(b)(4)'s mention of "unusual and compelling circumstances" as requiring the child to show anything unusual about herself or about the adult ready to care for her. I interpret the phrase to be simply a shorthand reference to the admittedly unusual and compelling circumstances of a juvenile who has no parent, guardian, or adult relative to take custody upon release, as contrasted with juveniles who have such parties to be released to under subsection (b)(1). The INS itself characterizes mandatory release under (b)(1) as "routine."[7] By contrast, release to an unrelated adult under subsection (b)(4) is neither mandatory nor routine, but rather it is an "unusual and compelling" circumstance in which discretion must be exercised so as to assure the child's well-being as well as appearance. So construed, the "unusual and compelling" language does not infringe due process because it imposes no impediment to release that is unrelated to the juvenile's status and the government's interest.
 
 
 122
 Because immigration is involved, the government has a greater interest in using the procedures now in place than it might have in other civil matters, such as commitment proceedings, or in criminal cases. There is little question that the INS is not in the business of social work,[8] and its disinclination to play probation officer as well as prosecutor is quite understandable. Yet the obvious value that the Court has seen in the array of safeguards built into the Bail Reform Act, and the New York Family Court Act authorizing pretrial detention of accused juvenile delinquents, which it considered in Salerno and Schall, must have great weight against the modest imposition that a reasonable time limit, hearing before a neutral officer and a level playing field would entail. An examining officer who is obliged to be impartial is obviously available because conduct of the prima facie evidence hearing is entrusted to such a person.
 
 
 123
 Moreover, apart from inconvenience and perhaps some expense, there is no readily apparent reason why the INS cannot discharge its parens patriae obligations by seeking appointment of a guardian ad litem for minors in its custody. See, e.g., Juvenile Justice and Delinquency Prevention Act, § 504, codified at 18 U.S.C. § 5034 (providing that magistrate may appoint guardian ad litem if parent or guardian of juvenile is not present, will not cooperate, or has adverse interests to the juvenile); Schall, 467 U.S. at 276 n. 25, 104 S.Ct. at 2416 n. 25 (noting that under § 320.3 of the New York Family Court Act, if juvenile's parent or guardian fails to appear after reasonable and substantial efforts have been made to notify such person, court must appoint a law guardian for the child). The probable value of such a procedure would be appreciable, in that the otherwise unassisted juvenile would have some legally responsible adult to assist in making placement decisions--and the INS would correspondingly be relieved of the task of individualized decisionmaking that it does not want in any event. While it would be inappropriate for a court to impose such a procedure on the INS just because it makes sense to a judge, it is appropriate to consider the availability and practicality of different procedures in determining whether current procedures comport with minimum requirements of due process. See Landon, 459 U.S. at 35, 103 S.Ct. at 330.
 
 
 124
 Considering current procedures and alternatives in light of the juveniles' interest in freedom from continued restraint and the government's in their well-being and appearance leads me to conclude that the balance tips against constitutional sufficiency of the process used by the INS in determining whether to release a child under § 242.24(b)(4). At a minimum, the juvenile who is presumptively eligible for release but has no parent or relative should be afforded an early hearing before a neutral officer. Unlike the majority or the district court, I would not remove the hearing officer's discretion, but that discretion should be informed by the government's interests in appearance and well-being and the juvenile's in release to a fully responsible adult.
 
 
 125
 Accordingly, I would affirm the district court's grant of summary judgment for Flores because the INS regulations fail to meet minimum requirements of procedural due process. I would strike those parts of the district court's judgment that rewrite § 242.24(b)(4) to require release to a "responsible adult party" who promises to bring the minor to future hearings and that mandate a probable cause hearing in place of the prima facie evidence hearing. I believe subsection (b)(4) as written affords greater flexibility and protection to minors in this respect than the order, because it permits release to any adult so long as that adult agrees to care for the child's well-being and to assure her presence. I would also strike the requirement of an administrative hearing to determine need for detention, and I would modify the order to require a prompt hearing before a neutral hearing officer to determine whether the minor should be released under § 242.24(b)(4) construed consistently with the constraints of due process.
 
 
 126
 WALLACE, Chief Judge, with whom Circuit Judges WIGGINS, BRUNETTI, and LEAVY join, dissenting:
 
 
 127
 The facts were adequately summarized in the majority panel opinion. See Flores v. Meese, 934 F.2d 991, 993-96 (9th Cir.1990) (Flores). I have no quarrel with the majority's assertion that alien children allegedly in this country illegally are impacted by the regulation at issue and have a right to challenge their detention. See Maj. op. at 1358-1360. But I find much of the majority's discussion, such as that regarding habeas corpus review, irrelevant to the crucial issues in this case, and other portions of the opinion lacking in support. I believe that the majority errs in implicitly defining the right at issue here as a blanket denial of liberty, thereby granting it a fundamental character, and in ignoring the deference that courts have traditionally paid to immigration laws and regulations. Primarily for these reasons, I respectfully dissent.
 
 
 128
 * My first disagreement with the majority is over the liberty right at issue. At oral argument, the alien children argued that the regulation impinged on their right to be free from physical restraint--a right to liberty which they allege is fundamental. The Immigration and Naturalization Service (INS), on the other hand, contended that the right at issue is a nonfundamental right to be released to unrelated adults. Without discussion, the majority adopts the former characterization, a characterization with which I disagree.
 
 
 129
 Perhaps the insistence on viewing the right at issue as a general "right to liberty" comes from the majority's mistaken characterization of the regulation as a "blanket detention policy." Maj. op. at 1354. As the facts demonstrate, however, the regulation results in no such blanket denial. The regulation does not bar the release of all alien juveniles, but merely those who do not have an identifiable parent, legal guardian or adult relative who can accept custody or designate an appropriate custodian. See 8 C.F.R. § 242.24 (1991). Even children whose release is not mandated under the regulation can, in the discretion of the INS, be released to other responsible adults. See id. § 242.24(b)(4). Thus, alien children awaiting deportation proceedings are eligible for release to a number of caregivers; the only liberty right denied them is the right to be released to unrelated adults without INS approval.
 
 
 130
 Given the limited scope of the regulation, I believe the majority errs by concluding that this case involves a "fundamental right to be free from government detention." Maj. op. at 1360. This broad characterization of the right involved conflicts with the Supreme Court's warning that rights and interests should be defined narrowly for the purposes of substantive due process balancing. See Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Bowers) (defining the right at issue as the right to engage in homosexual sodomy, rather than as the more general "right to be let alone"); Michael H. v. Gerald D., 491 U.S. 110, 121-27 & n. 6, 109 S.Ct. 2333, 2340-44, & n. 6, 105 L.Ed.2d 91 (1989) (plurality opinion). The majority fails to heed this warning in holding, without persuasive analysis, that the right implicated by the regulation is a general right to liberty.
 
 
 131
 The need to define the right narrowly is further supported by policy and precedent. No case has been cited to us (and I have found none) in which a court has ever recognized a fundamental substantive due process right to physical liberty. Instead, procedural due process analysis has traditionally provided adequate protection against any unwarranted deprivations of physical liberty. As Justice Scalia recently stated, "[t]he text of the Due Process Clause does not protect individuals against deprivations of liberty simpliciter. It protects them against deprivations of liberty 'without due process of law.' " Cruzan v. Director, Missouri Department of Health, --- U.S. ----, 110 S.Ct. 2841, 2859, 111 L.Ed.2d 224 (1990) (Scalia, J., concurring). To hold otherwise, would subject all physical detentions--in both the immigration context and criminal context--to judicial review under strict scrutiny to insure that their fundamental substantive due process "right to liberty" was not being infringed. Such cannot be the law.
 
 
 132
 None of the cases cited by the majority support its novel holding that this case involves a "fundamental right to be free from government detention." Maj. op. at 1360. For example, the majority cites a number of habeas corpus cases to establish the unremarkable proposition that aliens may challenge a detention through habeas corpus proceedings. See, e.g., Wing Wong v. United States, 163 U.S. 228, 233-38, 16 S.Ct. 977, 979-81, 41 L.Ed. 140 (1896) (sentence of one year of hard labor for all deportable aliens may be challenged through habeas corpus petition). However, the existence of a forum is quite separate from the definition or analysis of the right at issue, and these cases provide no support for the majority's application of heightened scrutiny to invalidate the INS regulation. Compare id. at 235, 16 S.Ct. at 980 ("[w]e think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens would be valid").
 
 
 133
 The majority also relies heavily on Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (Carlson), and United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (Salerno), for the proposition that this case implicates the "fundamental right" to be free from detention. However, in both of the cited cases, the Supreme Court upheld, rather than struck down, a challenged detention. In addition, neither support the conclusion that the limited detention policy at issue here need satisfy any form of heightened scrutiny.
 
 
 134
 In Carlson, the Supreme Court held that INS detention based on Communist party membership did not violate due process. To reach this conclusion, the Court first held that Congress had authorized the Attorney General to make discretionary decisions concerning detention pending deportation. 342 U.S. at 540, 72 S.Ct. at 534. Relying on the legislative history of the statute, the Court stated that "Congress [intended] to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse." Id. Applying this test, the Court concluded that the discretion was "certainly broad enough" to justify the challenged detention. Id. at 541, 72 S.Ct. at 534.
 
 
 135
 The majority argues that Carlson holds that "the INS cannot detain individuals without a particularized exercise of discretion through which it determines that detention of an individual would prevent harm to the community or further some other important governmental interest." Maj. op. at 1360. But such an inference is unsupported by either the reasoning, or the result in the case. As stated earlier, Carlson did not strike down the regulation, it found it well within the INS's discretion. In discussing the factors that supported the INS's exercise of discretion, the Court explicitly stated that such discretion "[could] only be overriden where it is clearly shown that it 'was without a reasonable foundation.' " Carlson, 342 U.S. at 541, 72 S.Ct. at 534; see also id. (detention need not be justified by "specific acts" performed by detained individual). Thus, Carlson actually undermines, rather than supports, the majority's broad characterization of the right at issue in this case and consequent application of heightened scrutiny to invalidate the INS regulation.
 
 
 136
 The majority also cites Salerno in support of its holding that the INS must come forward with "significant" reasons to justify its limited detention policy. But Salerno, which upheld pretrial detention under the Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., is not on point. First, Salerno involved a blanket detention of certain dangerous felons--the regulation at issue in this case is much narrower as it only prohibits release of alien minors to unrelated adults without INS approval. Compare 18 U.S.C. § 3142 with 8 C.F.R. § 242.24 (1991). Second, the Court's due process analysis in Salerno was geared primarily toward the rights of adult citizens facing detention in the criminal context. See Salerno, 481 U.S. at 747-52, 107 S.Ct. at 2101-04. The situation before us in this case involves the rights of juvenile aliens facing detention in the civil context, whose rights are not necessarily coextensive with those of adults. See infra, sec. II. In addition, Salerno did not squarely hold that freedom from pretrial detention was a fundamental right. Instead, the Court stated that "we cannot categorically state that pretrial detention offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." 481 U.S. at 751, 107 S.Ct. at 2103 (quotations and citations omitted). Thus, Salerno also does not support the majority's assumption that the detention policy implicates a "fundamental right" to liberty.[1]
 
 
 137
 The majority finally justifies its rejection of the INS's characterization of the right at issue by arguing that "the right to be released to unrelated adults" is merely the remedy the district court imposed in striking down the regulation. Maj. op. at 1361-1362. But the majority misses the point of its remedy analysis. The district court imposed the remedy of release to unrelated adults only because it concluded that a right was being denied, the right to be released to such adults. I believe it makes more sense to view the right and consequent remedy as coexistent; if the right at issue was broader, the remedy imposed by the district court to correct for its denial would necessarily have been broader.
 
 
 138
 In light of these considerations, I analyze the regulation as resulting in a denial of the nonfundamental right to be released to unrelated adults unless the INS grants permission. See Bowers, 478 U.S. at 194-95, 106 S.Ct. at 2846 (warning against the expansion of the list of fundamental rights). Because no fundamental right is involved, we must apply minimal scrutiny to the regulation, and consider whether it is rationally related to any legitimate end of government. Christy v. Hodel, 857 F.2d 1324, 1329 (9th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989). Both the INS's desire to protect the safety of the detained children, as well as its concern for potential liability for harm that could befall a released child, are legitimate ends to which the regulation is rationally related. See Flores, 934 F.2d at 1009-10; see also infra, sec. II. I therefore disagree with the majority's conclusion that the INS regulation violates substantive due process.
 
 II
 
 139
 Aside from its characterization of the right at issue as the fundamental right to liberty, I am further troubled by the majority's failure to recognize the special circumstances of this case. Two factors should influence our analysis of the constitutionality of the challenged regulation. First, the court's analysis should focus on the immigration context of this case, where judicial review is extremely limited. Second, the court must deal with the accepted principle that liberty interest is weighed differently for minors in comparison with adults.
 
 A.
 
 140
 Flores's constitutional claims arise in the unique context of our immigration laws. The power over immigration is political in nature and therefore vested in the political branches. Mathews v. Diaz, 426 U.S. 67, 81-82, 96 S.Ct. 1883, 1892-93, 48 L.Ed.2d 478 (1976) (Diaz); Jean v. Nelson, 727 F.2d 957, 965 (11th Cir.1984) (en banc) (Jean), aff'd on other grounds 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Although the executive and legislative branches in theory possess concurrent authority over immigration, "[i]n practice ... the comprehensive character of the INA vastly restricts the area of potential executive freedom of action, and the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with Congress." Jean, 727 F.2d at 965; see also United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950).
 
 
 141
 The Supreme Court has long recognized Congress's paramount power to control matters of immigration. Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977) (Fiallo); Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954); Carlson, 342 U.S. at 534, 72 S.Ct. at 531; Harisiades v. Shaughnessy, 342 U.S. 580, 589-90, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). Congressional power in this area is plenary; the Court has repeatedly stressed that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." Fiallo, 430 U.S. at 792, 97 S.Ct. at 1478, quoting Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). In exercising its broad power over immigration and naturalization, " 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " Id., quoting Diaz, 426 U.S. at 80, 96 S.Ct. at 1891. Because Congress's power over immigration is plenary and political in nature, the exercise of that power is subject " 'only to narrow judicial review.' " Id., quoting Hampton v. Mow Sun Wong, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1905 n. 21, 48 L.Ed.2d 495 (1976) (Hampton); Diaz, 426 U.S. at 81-82, 96 S.Ct. at 1892-93.
 
 
 142
 The plenary power of Congress and the narrowness of judicial review in the immigration context is reflected in the Supreme Court's teaching that any substantive due process rights aliens might have are extremely limited. For example, in Harisiades, the Court upheld the deportation, under the Alien Registration Act of 1940, of legally resident aliens who had been members of the Communist Party before passage of the Act. While acknowledging that the Act "stands out as an extreme application of the expulsion power," the Court rejected the aliens' argument that the Congress's power to deport was "so unreasonably and harshly exercised" that the Act violated the due process clause. 342 U.S. at 588, 72 S.Ct. at 518. Similarly, in Galvan, the Court upheld a statute that authorized deportation of legally resident aliens on the grounds that they had once been members of the Communist party, stating that "[w]e cannot say that this classification by Congress is so baseless as to be violative of due process." 347 U.S. at 529, 74 S.Ct. at 742. In subsequent cases dealing with both equal protection and substantive due process challenges under the fifth amendment, the Supreme Court reaffirmed the limited judicial role in reviewing immigration decisions. Fiallo, 430 U.S. at 792-93 & n. 4, 97 S.Ct. at 1477-79 & n. 4; Hampton, 426 U.S. at 99-103, 96 S.Ct. at 1903-05.
 
 
 143
 As a result of the judiciary's limited role in the immigration context, we have held that even if the right at issue is fundamental in character, the court should not apply strict scrutiny review to an immigration regulation. In Adams v. Howerton, 673 F.2d 1036 (9th Cir.), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982), we considered the argument that substantive due process required the application of strict scrutiny to an immigration statute dealing with spouses. The homosexual plaintiffs argued that, as interpreted to apply only to heterosexual marriages, the statute violated their right to same-sex marriage, a right they contended was fundamental. We stated that "[w]e need not ... reach the question of the nature of the claimed right or whether such a right is implicated in this case. Even if it were, we would not apply a strict scrutiny standard of review to the statute. [In the immigration area] the decisions of Congress are subject only to limited judicial review." Id. at 1041 (emphasis added and footnote omitted). Therefore, following Adams, and the extensive Supreme Court precedent in this area, even if I were to agree with the majority that this case involves a fundamental right, I would still apply rational review to evaluate the regulation.
 
 
 144
 The majority's failure to defer to the INS is also demonstrated by its ready conclusion that neither of the INS's articulated reasons are "significant" enough to support the regulation. The majority first rejects the INS's belief that the regulation serves to protect the safety of the detained children. It assumes that release of the children to unrelated adults will be far preferable to detainment by the INS. Maj. op. at 1362-1363. But the majority fails to cite any evidence in the record to support its factual assumption. Indeed, there is none. More important, the INS thinks otherwise, and in keeping with prior precedent I would defer to its estimation of the risks involved. No one on this court can be sure there is no evil awaiting an unsuspecting alien minor in the custody of an unrelated adult. A concern about that possibility is not unreasonable. Simply put, the majority contends that it owes no deference to the INS's views on child safety because "[c]hild welfare is not an area of INS expertise." Maj. op. at 1362. This is a far too limited view of the deference owed to the INS, one that conflicts with the Supreme Court's statement that "[a]ny policy toward aliens is vitally and intricately interwoven" with matters that have "been committed to the political branches of the Federal Government." Diaz, 426 U.S. at 81 & n. 17, 96 S.Ct. at 1892 & n. 17; see also Carlson, 342 U.S. at 538, 72 S.Ct. at 533 (pointing out that "[d]etention is necessarily a part of [the] deportation procedure").
 
 
 145
 The majority ignores the fact that any judicial branch intrusion, even if explained by a belief that the INS has no special expertise, severely undermines congressional power over immigration. The majority's citation to Hampton, fails to support this intrusion, because that case dealt with the federal Civil Service Commission, not the INS. See 426 U.S. at 101, 96 S.Ct. at 1904 (recognizing political character of power over immigration, but rejecting argument that deference extends to "any agency of the National government"). I therefore disagree with the majority's casual conclusion that the INS must put forth affirmative evidence to demonstrate "that detention serves the best interests of members of the plaintiff class." Maj. op. at 1363. I would not strike down so easily the INS's efforts to protect the detained children, and would consider those efforts significant enough to support the regulation.
 
 
 146
 The majority also casually dismisses the INS's claim that releasing children to unrelated adults could result in tort liability. While acknowledging that the minors would have a cause of action against the INS for a violation of their rights, the majority finds the chance of tort liability "remote at best." Maj. op. at 1364, quoting International Union, UAW v. Johnson Controls, Inc., --- U.S. ----, 111 S.Ct. 1196, 1208, 113 L.Ed.2d 158 (1991). The sole support for this assertion is DeShaney v. Winnebago County Social Services Department, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (DeShaney), where the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197, 109 S.Ct. at 1004.
 
 
 147
 A careful reading of DeShaney reveals that the case has no bearing on the possibility that the INS will be held liable for releasing alien minors to unrelated adults. In holding that DeShaney could not recover against the state welfare agency for its failure to remove him from an abusive home environment, the Court repeatedly emphasized that "the State played no part in creating [the danger]" and was not liable merely for its failure to confer aid. Id. at 196-97, 201, 109 S.Ct. at 1003-04, 1006. However, the Court was careful to distinguish DeShaney's case from one where the dangerous situation was created by the State action. In the latter situation, the Court was unwilling to foreclose liability, and instead stated that "[h]ad the State by the affirmative exercise of its power removed Joshua [DeShaney] from free society and placed him in a foster home operated by its agents, we might have a situation [that would] give rise to an affirmative duty to protect." Id. at 201 n. 9, 109 S.Ct. at 1006 n. 9. Thus, DeShaney clearly does not foreclose the possibility of INS liability for injury to a released child, when the harm occurred after the INS placed him or her in the care of an unrelated adult. See id.
 
 
 148
 The majority's assertion that the INS is unlikely to suffer any liability also seems odd in light of its holding that the INS must release minors to unrelated adults only after "mak[ing] the necessary determination of whether a party who is willing to assume custody is fit to do so." Maj. op. at 1363-1364. In light of the majority's apparent acceptance of the INS's claim that it lacks the resources or expertise to conduct these studies, maj. op. at 1363, its imposition of a duty to do so seems likely to result in liability. At any rate, given our deferential review, I would defer to the INS's rationale for the policy rather than seeking out reasons to discredit it.
 
 B.
 
 149
 In addition to failing to give required deference to the INS regulation, the majority accords no significance to the fact that this case involves detention of children, rather than adults. Because the INS's reasons for the policy relate directly to their responsibility to protect minors, I believe that the Supreme Court's teachings regarding the constitutional rights of minors are relevant to our analysis.
 
 
 150
 As the majority correctly points out, there is no doubt that children are " 'persons' under our Constitution" who possess "fundamental rights which the State must respect." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969); In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967) ("whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"). However, the majority fails to include in its analysis the Supreme Court's often stated teaching that constitutional rights of children are not coextensive with those of adults. See, e.g., Schall v. Martin, 467 U.S. 253, 263-66, 104 S.Ct. 2403, 2409-11, 81 L.Ed.2d 207 (1984) (Schall); Bellotti v. Baird, 443 U.S. 622, 633-39, 99 S.Ct. 3035, 3042-46, 61 L.Ed.2d 797 (1979) (plurality opinion) (Bellotti); McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).
 
 
 151
 The Court has specifically recognized the narrower scope of juveniles' liberty interest. In Schall, the Court held that the state may restrict a child's liberty interest in order to secure that child's welfare. In upholding the constitutionality of a New York statute authorizing the pretrial detention of certain juveniles, the Court stated:
 
 
 152
 The juvenile's ... interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial.... But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody. Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as parens patriae. In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's "parens patriae interest in preserving and promoting the welfare of the child."
 
 
 153
 467 U.S. at 265, 104 S.Ct. at 2410 (citations omitted), quoting Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982); see also Bellotti, 443 U.S. at 634, 99 S.Ct. at 3043 (stating three reasons why "the constitutional rights of children cannot be equated with those of adults," including "the peculiar vulnerability of children").
 
 
 154
 In my view, the teachings of Schall and Bellotti are particularly relevant to the facts of this case. The INS's regulation governing the detention of minors is based at least in part upon a concern for the "peculiar vulnerability" of alien minors. See Bellotti, 443 U.S. at 635, 99 S.Ct. at 3044 ("the State is entitled to adjust its legal system to account for children's vulnerability"). Thus, the INS's regulation is an exercise of governmental power which takes into account the need to provide for children "[when] parental control falters." Schall, 467 U.S. at 265, 104 S.Ct. at 2410.
 
 
 155
 The majority ignores these cases, and instead relies on In re Gault, for the proposition that "children should be treated in a manner least restrictive of liberty." Maj. op. at 1362. In re Gault dealt with a procedural, rather than substantive, due process challenge, and I am at a loss to find any categorical statement concerning the liberty rights of children in the text of the opinion. Compare In re Gault, 387 U.S. at 13, 87 S.Ct. at 1436 (stating that bill of rights does not apply in same manner to children as adults). Moreover, since In re Gault was decided, the Supreme Court has made it clear that childrens' liberty interests are not identical to those of adults. Schall, 467 U.S. at 265, 104 S.Ct. at 2410.
 
 
 156
 The majority also relies heavily on federal and state policies which, it claims, "favor[ ] avoidance of institutionalization of juveniles." Maj. op. at 1361. However, even assuming the existence of such policies, they are irrelevant to our analysis. The question presented here is what the Constitution requires, not what federal and state governments favor. See DeShaney, 489 U.S. at 202-03, 109 S.Ct. at 1006-07 (drawing distinction between duties imposed by state legislature and duties embodied in the Constitution). I therefore fail to see how legislative policy "compels the conclusion that" the plaintiffs' status as minors is irrelevant to our assessment of their constitutional rights. Maj. op. at 1361.
 
 
 157
 Thus, I believe that the Supreme Court's rulings regarding the diminished liberty interests of minors should be factored into our constitutional analysis. The majority therefore errs in asserting that there is "no legal basis" for the INS's professed concern for the best interests of alien minors. Maj. op. at 1362. Because the INS's statement of reasons for the limited detention policy are concerns that the Supreme Court has already found legitimate, this is additional evidence that the challenged regulation is reasonable.
 
 III
 
 158
 In the final section of the opinion, the majority upholds the district judge's ruling that a minor taken into custody must be given "an administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release." Although the district judge's ruling apparently rested on the procedural due process test embodied in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), see Flores, 934 F.2d at 1011, the majority sees no need to determine whether Gerstein applies in this case. Instead, the majority concludes that the new procedural requirements are logically connected to its holding that the INS may not detain minors solely on the ground that there is no adult or legal guardian to care for the child. Maj. op. at 1364.
 
 
 159
 The majority states that requiring detention hearings does not materially alter existing INS regulations. Maj. op. at 1364. In reaching this conclusion, the majority holds that the district judge's order only imposes two additional requirements on the INS. First, the order makes detention hearings mandatory, when the hearings were previously only available at the request of the minor. Id.; see 8 C.F.R. § 242.2(c) & (d) (1991). Second, the order requires that the hearing include an inquiry into whether a nonrelative may be appropriate to take custody of the child. Maj. op. at 1364.
 
 
 160
 As stated earlier, I do not agree that the INS regulation at issue here violates substantive due process. I therefore cannot join in the majority's imposition of these new procedural requirements. However, the majority's analysis is problematic for a second reason--it fails to acknowledge, much less analyze, the possible broader implications of the judge's order. This issue needs to be clarified.
 
 
 161
 The district judge held that "[a]ny minor taken into custody" shall be given "an administrative hearing to determine probable cause for his arrest." Under current INS procedures, minors arrested without a warrant are entitled to have probable cause reviewed by an immigration official "without unnecessary delay." See 8 U.S.C. § 1357(a)(2). Because this procedure existed prior to the Flores litigation, the panel speculated that the district judge intended to impose an additional requirement that the probable cause hearing take place before an immigration judge. Otherwise, the majority pointed out that "the injunction [would be] deprive[d] of much practical effect." Flores, 934 F.2d at 1011.
 
 
 162
 By holding that the judge's order will not materially affect INS procedures, the majority implicitly rejects the panel's original assumption and holds instead that the current arrest and probable cause requirements satisfy the judge's order. Any other interpretation of the order is inconsistent with the majority's refusal to engage in any due process analysis. Therefore, despite the broad language of the judge's order, the majority's affirmance of that order should not be read to require any change in these procedures.
 
 
 163
 I also do not read the majority's opinion as imposing any additional requirements on the INS in terms of timing and execution of the detention hearings. The majority references the current hearing procedures as adequate to safeguard the interests of the minors. See maj. op. at 1364. Therefore, with the exception of the new requirement that such hearings be held automatically, the majority opinion does not entail any alteration in current INS procedure.
 
 
 164
 The procedural component of the district judge's order is potentially quite sweeping. For this reason, I adhere to my original position, as stated in the panel majority opinion, that we should remand the case for a determination of what procedures are constitutionally required under Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See Flores, 934 F.2d at 1011-13 (discussing appropriate test for procedural due process analysis).
 
 
 
 [1]
 The regulation provides in full as follows:
 Detention and release of juveniles.
 (a) Juveniles. A juvenile is defined as an alien under the age of eighteen (18) years.
 (b) Release. Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:
 (1) Juveniles shall be released, in order of preference, to: (i) A parent; (ii) legal guardian; or (iii) adult relative (brother, sister, aunt, uncle, grandparent) who are not presently in INS detention, unless a determination is made that the detention of such juvenile is required to secure his timely appearance before the Service or the immigration court or to ensure the juvenile's safety or that of others.
 In cases where the parent, legal guardian or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at an INS office located near the parent, legal guardian, or adult relative.
 (2) If an individual specified in paragraph (b)(1) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in INS detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.
 (3) In cases where the parent or legal guardian is in INS detention or outside the United States, the juvenile may be released to such person as designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.
 (4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraph (b)(1) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the INS or an immigration judge.
 
 
 [2]
 A state would of course face a somewhat greater threat of liability after releasing a child to the custody of a responsible third party as opposed to the custody of a parent as in DeShaney. This is because the state would have acted affirmatively to place the child in a home from which the child had not originally come, as opposed to returning the child to the same home and assuring placement in "no worse position than that in which he would have been had [the state] not acted at all." Id. at 201, 109 S.Ct. at 1006
 
 
 [1]
 Indeed, the Supreme Court's recent opinion in Cruzan v. Director, Missouri Dep't of Health implicitly acknowledges this substantive right when it affirms the individual's right, under the due process clause of the fourteenth amendment, to refuse unwanted medical treatment. --- U.S. ----, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990)
 
 
 [2]
 The dissent and the original panel attach significant weight to Justice Scalia's statement in Cruzan, --- U.S. at ----, 110 S.Ct. at 2859 (Scalia, J., concurring), that the due process clause "does not protect individuals against deprivations of liberty simpliciter. It protects them against deprivations of liberty 'without due process of law.' " Yet no other member of the Supreme Court joined Justice Scalia's straitened reading of the fifth amendment
 
 
 [3]
 This regulation covers arrests of persons without a warrant. The issuance of a warrant is covered by 8 C.F.R. § 242.2(c). These arrest warrants are issued by INS officers, not neutral third parties. Thus even the presence of an arrest warrant does not indicate that the decision to detain has been reviewed by an official independent of the law enforcement function
 The majority correctly notes that a child may have the propriety of her detention or of conditions on her release reviewed by an immigration judge if she specifically requests such a hearing. 8 C.F.R. § 242.2(d). INS officers, however, are not required to inform arrested children of this right. See 8 C.F.R. § 242.2(c)(2). This provision thus does nothing to cure the constitutional defect in the INS's procedures. Freedom from governmental restraint is not a right reserved exclusively for those schooled in the intricacies of INS regulations. "No matter how elaborate and accurate the ... proceedings available under the [regulation] may be once undertaken, their protection is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place." Doe v. Gallinot, 657 F.2d 1017, 1023 (9th Cir.1981) (footnote omitted).
 
 
 [1]
 Bowers held that the Due Process Clause of the Fourteenth Amendment does not prohibit states from criminalizing homosexual sodomy
 
 
 [1]
 Obviously amici present no such risk. Neither the district court's order nor the majority's opinion, however, would limit release to organizations of their caliber. "Responsible adult party" is left undefined; a financially responsible adult may not be morally responsible, and vice versa. Nor does the order restrict release to a legally responsible adult, by contrast with 8 C.F.R. § 242.24(b)(4), which requires an unrelated adult to whom a juvenile may be released to execute an agreement to care for the juvenile's well-being. See also § 242.24(b)(3) (imposing a similar requirement on a person designated by the parent or legal guardian to take custody of a detained juvenile in their absence). So the district court's order also leaves open the possibility of release to an adult who appears to be morally and financially responsible, but whose legal responsibility for care and presence lacks teeth and is unenforceable
 
 
 [2]
 Section 242.24(b)(4) appears to assume that the INS has made no determination that detention is required to ensure timely appearance or safety. While release to an unrelated adult is not mandatory, as it is to a parent, guardian or adult relative under § 242.24(b)(1), the regulation itself creates a liberty interest in freedom from continued restraint. The dispositive question for us, therefore, is whether the procedures by which the INS decides if it should release a juvenile to the custody of an unrelated adult survive facial challenge
 Assuming that alien juveniles have a protected liberty interest in freedom from institutional restraint such that their failure to be released to a "responsible adult" who promises future appearances triggers substantive due process scrutiny, see Salerno, 481 U.S. at 750, 107 S.Ct. at 2103, their interest "must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." Schall v. Martin, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984). Thus, their real interest is not in freedom from restraint (detention), but in freedom from a particular kind of limitation on the conditions under which release will be permitted. Because the children are minors, the government's parens patriae responsibilities are implicated and the juveniles' interest in freedom from restraint is therefore less substantial than an adult's and their interest in being released to any "responsible adult" is less substantial than their interest in being released to a parent, guardian or family member with whom they enjoy a natural or legal bond. By the same token, the government's interests in exercising its nearly plenary power over immigration, and discharging its obligation to protect and promote the welfare of juveniles within its custody, are substantial.
 
 
 [3]
 Flores also complains of the Catch-22 the regulation creates on account of the fact that parents or adult relatives of alien juveniles may be deterred from coming forward to the INS because they, too, may be here illegally. While there is nothing much for it, the conundrum does to some extent affect the juveniles' opportunity to rejoin their family. See Landon, 459 U.S. at 34, 103 S.Ct. at 330 (right to rejoin immediate family ranks high among the interests of the individual)
 
 
 [4]
 In Salerno, 481 U.S. at 751-52, 107 S.Ct. at 2103-04, the extensive safeguards under the Bail Reform Act included: judicial evaluation of likelihood of dangerousness; detainees had right to counsel and could testify and present information; the judicial officer's discretion was statutorily guided; the government bore the burden of proof by clear and convincing evidence; and the judicial officer had to make findings of fact and give reasons for a decision to detain, which was immediately reviewable on appeal. In Schall, 467 U.S. at 257 n. 3, 270, 104 S.Ct. at 2406 n. 3, 2413, preventive detention of juveniles suspected of a criminal offense promoted legitimate interests of society and the juvenile and did not amount to punishment such that it offended substantive due process when: the detention was limited in time; a neutral magistrate determined that detention was necessary; the time limits seemed suited to the limited purpose of providing the young person with a controlled environment and separating the juvenile from improper influences pending a speedy disposition of the case; and the conditions of confinement reflected regulatory purposes that were not inconsistent with parens patriae objectives
 
 
 [5]
 Subsection 242.24(b)(4) provides for a decision on release to an adult other than a parent, guardian or relative to be made by the district director or chief patrol agent. The INS suggests no reason why this determination could not be made in conjunction with the prima facie evidence hearing
 
 
 [6]
 See supra note 4
 
 
 [7]
 Supplemental Brief at 1 n. 2
 
 
 [8]
 Cf., e.g., Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (courts defer to decisions of qualified professionals, meaning a person competent to make particular decision at issue)
 
 
 [1]
 The additional cases cited by the two separate concurrences also do not support the majority's application of heightened scrutiny to invalidate the INS regulation. For example, DeShaney v. Winnebago County Social Services Department, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), only makes passing reference to "restraint[s] of physical liberty," when discussing situations where the state's affirmative exercise of power gives rise to a duty to protect. Id. at 199-200, 109 S.Ct. at 1005-06, citing Youngberg v. Romero, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (state has duty to provide safe conditions to involuntarily committed mental patients). DeShaney cannot be read as establishing any general right to liberty; indeed, its holding only addresses the issue of whether the government's failure to confer aid violates due process. Id. at 202, 109 S.Ct. at 1006. Board of Pardons v. Allen, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), is also not on point, because it deals with procedural due process issues that arise after a statute has created a liberty interest. Id. at 372-73, 107 S.Ct. at 2417-18. Allen does not address any constitutionally-based substantive due process challenge. Other cases cited by the concurrences are similarly inapplicable here. See Parham v. J.R., 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (rejecting children's procedural due process challenge to state's procedures for involuntary commitment); Greenholtz v. Inmates, Nebraska Penal & Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (rejecting procedural due process challenge to parole release hearings)
 One case cited by the concurrences does address an issue similar to the one before this court. In Youngberg, the Court articulated a standard for evaluating deprivations of liberty that occur during the course of an involuntary commitment. After holding that the liberty interest asserted by the inmate was protected by the due process clause, the Court stated that the challenged physical restraints would be upheld as long as the actions of the mental health therapists were reasonable. 457 U.S. at 316, 322, 102 S.Ct. at 2458, 2461. The Court stated: "the Constitution only requires that the courts make certain that professional judgment in fact was exercised ... this standard is lower than the 'compelling' or 'substantial' necessity tests the Court of Appeals would require." Id. at 321-22, 102 S.Ct. at 2461 (quotations omitted). Thus, Youngberg actually undermines the position of the concurrences by demonstrating that deprivations of liberty need not be evaluated using heightened scrutiny.